IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| SANDRA L. O'BRIEN and<br>DONNA E. PETERSON, | *<br>*<br>* | |
| Plaintiffs, | *<br>* | |
| vs. | * | No. 4:06CV00674 SWW |
| | * | |
| MIKE JOHANNS, Secretary, United States<br>Department of Agriculture, | *<br>*<br>* | |
| Defendant. | * | |

**MEMORANDUM OPINION AND ORDER**

Sandra L. O'Brien ("O'Brien") and Donna E. Peterson ("Peterson") bring this case under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, against the United States Department of Agriculture ("USDA"), alleging racial harassment and retaliation. Peterson also alleges constructive discharge. This case is set for trial the week of August 13, 2007. Now before the Court is defendant's motion for summary judgment to which plaintiffs responded and defendant replied. After careful consideration, and for the reasons stated below, the Court determines that the motion for summary judgment should be granted.

**Background**

O'Brien, a white female, is employed by the USDA, Natural Resources Conservation Service ("NRCS") in Little Rock, Arkansas, as a Human Resources Specialist. Peterson, a white female, was employed by the NRCS in Little Rock in the position of Human Resources Officer, from May 17, 1981, until April 30, 2005. Peterson was O'Brien's supervisor during the relevant time period.

Kalven Trice, a black male, was the State Conservationist for Arkansas, the chief NRCS official in Arkansas, and Peterson's second line supervisor. Joseph Manuel, a white male, was Peterson's first line supervisor from May 2001 to August 19, 2004.

In 2003, following several cancer surgeries, O'Brien was receiving chemotherapy. On May 27, 2003, she submitted a request to Manuel for permission to work from home. Manuel submitted the request to Trice, who took no action. On September 13, 2003, O'Brien submitted a second request, which Trice approved on September 22, 2003. O'Brien worked from home for two days after Trice approved her request.

On September 30, 2003, O'Brien, whose job was to rate and rank job applicants, issued a list of the best qualified candidates for two secretarial positions to Trice, the selecting official. On October 9, 2003, Trice called Manuel to his office to explain the ranking and rating of the applicants. Manuel could not a answer Trice's questions so he called O'Brien into Trice's office.[1] During the meeting, Trice questioned O'Brien about alleged inconsistencies and deficiencies in her rating and ranking of the panels. O'Brien testified she believed Trice was upset that a friend of his, a black female, was not on the list of rated applicants.[2] O'Brien said she had been rating candidates for years and had never been asked such detailed questions about how she arrived at the points she gave particular candidates.[3] Both Trice and O'Brien raised their voices, and O'Brien considered Trice

---

[1] O'Brien was the only person in Arkansas trained and certified to rate and rank the applicants. Rating and ranking involves two groups of applicants. Applicants from outside the agency are ranked by the Delegated Examining Unit ("DEU"). This was done internally in Arkansas by O'Brien. Persons within the agency seeking the position are determined to be eligible through the merit selection process.

[2] Def's. Mot. Summ. J., Ex. 3 at 44.

[3] *Id.* at 48.

to be berating and verbally battering her. She began to cry. Peterson became aware that the meeting was in progress and decided to enter Trice's office. Peterson advised O'Brien to leave, and the meeting continued with Peterson, Trice, and Manuel.

O'Brien filed an informal complaint with the EEOC on October 15, 2003. She claimed Trice retaliated against her for testimony she gave in January 2000 at an EEOC hearing concerning a complaint Peterson filed against Trice in 1997.[4] She also alleged hostile work environment and harassment.[5]

In mid-October 2003, Trice sent the application files prepared by O'Brien to the regional office for a second opinion on the ratings and rankings of the secretarial applicants. On October 29, 2003, Peterson sent an e-mail to Anderson Neal, a black male, who was assistant state conservationist of operations, asking him to ask Trice to return the application files. The files were returned from the regional office in late January or early February 2004. On December 4, 2003, Trice informed Manuel by telephone that he did not want Human Resources to rate and rank any applications. On December 8, 2003, Trice directed Manuel by e-mail not to rate and rank any panels.

At some point, Manuel designated Peterson to serve as acting state administrative officer for the month of November 2003. Peterson sent an e-mail to all employees, notifying them she would be serving in that capacity while Manuel was on leave. When Trice learned of this, he sent an e-mail to all employees, advising them that Neal would be acting state administrator for that period of time.

---

[4] Comp. at ¶ 9; Def's. Mot. Summ. J., Ex. 3 at 36-7.

[5] Def's. Mot. Summ. J., Ex. 3 at 62.

In November 2003, O'Brien, Peterson, and Linda Aldridge, another human resource employee supervised by Peterson, attended an Office of Personnel Management ("OPM") training session in San Diego, California. The training committee approved the OPM training for Aldridge and O'Brien but not for Peterson. Manuel approved the training for all three but did not inform Trice. On November 17, 2003, Trice asked Manuel about the whereabouts of the human resource staff. Trice thought it was inappropriate for the entire staff to go the same training and asked Manuel to provide him with the out-of-state training policy and travel authorization for the San Diego trip. Manuel asked Peterson to pull the information. Trice later obtained copies of pertinent travel vouchers from various staff members.

On January 15, 2004, Trice received a report from the regional office which found discrepancies and inconsistencies in the process O'Brien used to rate and rank applications. Trice wrote a confidential memorandum on January 22, 2004, addressed to Manuel and copied to members of the management team. Trice attached a copy of the regional office review. On January 27, 2004, Trice met with Manuel and Peterson, and instructed them to review the regional office's findings. On February 9, 2004, Manuel and Peterson submitted their review. Trice was upset with their review because they rebutted the regional office's findings and forwarded copies of their review to Trice's supervisor before giving Trice an opportunity to review their findings.

On February 10, 2004, Trice met with Manuel and Peterson to discuss their review. He directed Manuel not to send copies of correspondence to his superior or anyone above the state conservationist level without Trice's prior approval. In a memorandum dated February 12, 2004,

4

Trice told Manuel it appeared Manuel had tried to find holes in the regional office's findings rather than address the issues raised, and Trice found this unacceptable.

O'Brien followed up her informal complaint of October 2003 with a formal complaint in December 2003. Diane McFadden, a black female, and Shelly Moore, a white female, were directed to conduct an investigation to determine whether there was a hostile work environment at the NRCS office in Little Rock. They conducted their investigation on January 22 and 23, 2004. They concluded that Trice had not created a hostile work environment for O'Brien. Trice announced the results of the investigation at a management team meeting in March 2004.

In March 2004, O'Brien was scheduled to attend a yearly DEU training session in Texas. She also was supposed to review the Texas office's DEU procedures. She complains that Trice refused to permit her to perform the review, and that Trice told others that O'Brien would not be attending the training session until her Opportunity to Improve ("OTI") period had ended. O'Brien testified she was not on an OTI.[6]

On June 18, 2004, Trice reinstated the DEU activities in the state, and directed Manuel to determine whether disciplinary actions should be taken against O'Brien and Peterson. Working with Brock Chalmers, a white male and a regional employee relations specialist, Manuel and Chalmers determined that it was not appropriate to charge the plaintiffs.

Peterson contacted an EEOC counselor on March 2, 2004, and filed a formal complaint on July 14, 2004. On March 8, 2004, Peterson submitted a request to tele-commute from home. On March 13, 2004, Trice approved the request by e-mailing a statement approving the request.

---

[6] *Id*. at 150-51; Pls.' Resp. to Def's. Mot. Summ. J., Ex. 1 (O'Brien Aff.) at ¶ 9.

Peterson did not accept Trice's e-mail approval of her request because she did not have a signed agreement from Trice. Two months later, he provided Peterson with a copy of the tele-commuting agreement.

On March 31, 2004, Aldridge sent an e-mail to all employees reminding them that it was time for mid-year progress reviews. On April 2, 2004, Trice sent an e-mail to Manuel and Peterson asking them to delay their mid-year reviews. On the same day, Peterson e-mailed Trice, telling him she had completed the performance reviews for her staff. Peterson sought a performance award for O'Brien. The award was denied on October 15, 2004.

O'Brien filed a second formal complaint of discrimination on May 29, 2004. Manuel filed a formal complaint of discrimination on June 7, 2004, alleging hostile work environment.

On May 14, 2004, Bruce Knight, a white male, Chief of the NRCS, held a meeting with the Arkansas NRCS employees to announce the start of work in Arkansas on the largest contract in the nation. When the floor was opened for questions from the employees in attendance, Peterson asked Knight if he were familiar with the No Fear Act[7] and the number of complaints that had been filed in Arkansas. On May 17, 2004, Trice asked Peterson to provide him with a one-page issue paper on her concerns and the No Fear Act. On May 21, 2004, Peterson submitted the paper as instructed.

---

[7] The Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002 ("No Fear Act"), 5 U.S.C. § 2301, went into effect October 1, 2003. It includes provisions which require agencies to reimburse the Judgment Fund of the Department of Justice in cases in which there is a settlement or an award in an employment discrimination case. The Act also requires agencies to discipline employees who are responsible management officials in cases in which there has been a finding of discrimination, and provides additional reporting requirements for agencies.

On June 3, 2004, she e-mailed a copy of the paper to Knight. In July 2004, Knight asked Trice if he were aware Peterson had sent him a copy of the paper. Trice was not aware. On July 14, 2004, Trice held a meeting with Manuel and Peterson, and asked Peterson if she knew that Trice had already told Manuel to let him know before they went over Trice's head on work product items. Peterson said she was aware of the request but did not think it applied to her. Trice told her it did.

On October 12, 2004, the National Headquarters Office notified Trice that his DEU authority was suspended. On November 16 and 17, 2004, Pamela Boylen, a black female, and Valerie Smith, a white female, members of an employment classification team from National Headquarters, visited Arkansas to conduct an on-site review. On or about March 18, 2005, DEU authority was reinstated.

On October 12, 2004, Trice issued a memorandum to Doris Washington, a black female and Manuel's successor, stating that Aldridge and O'Brien had claimed an upgraded room on their travel vouchers concerning their November 2003 San Diego trip, and that Peterson had inappropriately approved the excessive lodging claim. In fact, Aldridge and O'Brien had shared an upgraded room so that O'Brien could have access to a refrigerator for her medicine. However, rather than splitting the cost between the two vouchers, O'Brien claimed $50 per night for the room and Aldridge claimed $110 per night. Regulations provide for dividing the cost of the room between the two persons staying in the room and reimbursement of one-half of the double occupancy rate.

Peterson retired on April 30, 2005. She was replaced by a white female. Peterson claims she was constructively discharged. Both O'Brien and Peterson allege they were subjected to a hostile work environment and suffered retaliation for engaging in protected activity. Defendant

argues plaintiffs cannot establish a prima facie case of either discrimination based on race or retaliation, or hostile work environment.

## Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of her pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to

an essential element of its claim." *Arnold v. Nursing and Rehab. Ctr. At Good Shepherd, LLC,* 471 F.3d 843, 845-6 (8th Cir. 2006)(internal citation omitted).

## Discussion

Plaintiffs claim they were subjected to a hostile work environment due to their race, that they were retaliated against for engaging in protected EEO activity, and that Peterson was constructively discharged due to her race and protected activity.

**1.      Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1).   To establish a prima facie case of racial discrimination based on a hostile work environment, a plaintiff must establish that (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment affected a term, condition, or privilege of employment.

Hostile work environment that is actionable under Title VII "occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Palesch v. Missouri Comm'n on Civil Rights,* 233 F.3d 560, 566 (8th Cir. 2000)(internal quotations omitted).  "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." *Nitsche v. CEO of Osage Valley Elec. Co-op.,* 446 F.3d 841, 846 (8th Cir. 2006). "Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment." *Burkett v. Glickman,* 327

F.3d 658, 662 (8th Cir. 2003). "A plaintiff must establish harassment that is so intimidating, offensive, or hostile that it poisoned the work environment." *Gilooly v. Missouri Dep't of Health,* 421 F.3d 734, 738 (8th Cir. 2005)(internal citations and quotations omitted). The Court can determine "whether an environment is 'hostile' or 'abusive' ••• only by looking at all the circumstances[,which] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Al-Zubaidy v. Tek Indus., Inc.,* 406 F.3d 1030, 1038 (8th Cir. 2005)(internal quotations omitted).

Defendant argues plaintiffs cannot establish they suffered an adverse employment action affecting a term, condition, or privilege of employment. Taking the facts in a light most favorable to plaintiffs, the evidence shows that during the meeting on October 9, 2003, Trice verbally abused and yelled at O'Brien, who was still suffering from the effects of treatment for her cancer. Following the meeting, O'Brien filed an EEOC claim and according to O'Brien, Trice began to retaliate against her by clandestinely removing files from O'Brien's office and sending them to the regional office for Jacque Thibodeaux-Horne, a black female, to review. O'Brien says Trice suspended her DEU authority for several months and thereby impacted her ability to do her job. She states he continued to keep pressure on her to hire a black applicant. O'Brien relates how upset Trice was when Manuel and Peterson disagreed with Thibodeaux-Horne's report on O'Brien's applicant rating and ranking process, and how Trice forwarded portions of the files to the agency's national office for review. In addition to manipulating the DEU process, O'Brien says Trice unfairly scrutinized her travel vouchers, and his investigation of plaintiffs' San Diego training session

continued for a year. According to O'Brien, Trice falsely told one of her colleagues in Texas that O'Brien was under an OTI, embarrassing her and hurting her career chances. Trice also instructed Manuel and Brock Chalmers to develop a suspension letter for O'Brien.

Peterson states that after she and Manuel found mistakes with Thibodeaux-Horne's report, Trice excessively scrutinized her work and told Manuel to punish or suspend her. She said Trice sent partial files to the national office for review in order to manipulate the review to produce the result he wanted, and to "set her up."[8] Peterson asserts Trice treated a black employee who had been misusing a government vehicle more leniently than a white employee who had violated policy on the use of a government vehicle. She also claims Trice allowed a black employee to work at an office closer to her home but effectively denied her request to work from home by delaying action on it.

In *Bradley v. Windall,* 232 F.3d 626, 630 (8th Cir. 2000), the plaintiff alleged she had been subjected to a hostile work environment when her supervisor "made various negative comments in her regard, removed much of her decision-making authority, encouraged her employees to bypass the chain of command, gave white employees preferential treatment, instructed employees to spy on her activities, had disparaging memos placed in her file, attempted to "set her up" to fail a hospital inspection, and generally treated her in a disrespectful and discriminatory manner." The Eighth Circuit affirmed the district court's grant of summary judgment, holding that while the "conduct cited by Bradley may have resulted in a frustrating work situation," it was not "so severe or pervasive as to have affected a term, condition, or privilege of employment." *Id.* at 631. The

---

[8]Pls.' Resp. to Def's. Mot. Summ. J., Ex. 2 (Peterson Aff.) at ¶ 7.

court also noted the lack of evidence "beyond her own speculation,"that would tie the alleged adverse actions to the plaintiff's protected status. *Id.* at 632.

There is no question plaintiffs were unhappy when Trice questioned their DEU procedures, delayed acting on their requests to work from home, and examined their travel vouchers. They were made more unhappy when Trice considered disciplining them and complained about their job performance. According to Aldridge and another co-worker, Kathy Anderson, Trice was "extremely petty, vindictive and abusive" toward them and the plaintiffs "among others."[9] Plaintiffs state Trice "injected race into the workplace," "criticized, berated, disciplined, and verbally abused" them because they are white, and did not take similar actions against black employees.[10] According to Peterson, Trice said Peterson tried to "'demonize' him because he is black and that '[a]ccording to Ms. Peterson's allegations with my black face I cannot look or speak to white females without being accused of wrongdoing. This slave mentality must stop.'" [11]

The Court finds plaintiffs have set forth insufficient evidence to create a genuine issue of material fact whether the harassment affected a term, condition, or privilege of employment. The evidence presented does not show objectively hostile conduct. Plaintiffs fail to proffer evidence creating a genuine issue of fact whether Trice's actions were "so intimidating, offensive, or hostile that [they] poisoned the work environment." *Gilooly,* 421 F.3d at 738. Therefore, the Court finds

---

[9] *Id.*, Ex. 3 (Aldridge Aff.) at ¶ 3 and Ex. 4 (Anderson Aff.) at ¶ 3.

[10] *Id.,* Ex. 1(O'Brien Aff.) at ¶ ¶ 4 & 6 & Ex. 2 (Peterson Aff.) at ¶ ¶ 4 & 5.

[11] *Id*., Ex. 2 (Peterson Aff.) at ¶  4 .

12

defendant is entitled to summary judgment on plaintiffs' claim of hostile work environment in violation of Title VII.

**2. Retaliation**

Title VII prohibits retaliation against an employee who files charges of discrimination or assists others in opposing discrimination. 42 U.S.C. § 2000e-3(a); *Thompson v. Bi-State Dev. Agency,* 463 F.3d 821 (8th Cir. 2006). Absent direct evidence of retaliation, the Court must apply the *McDonnell Douglas* three-part burden-shifting analysis to plaintiffs' retaliation claims. *Thompson,* 463 F.3d at 826. Under this framework, the Court must first determine whether plaintiffs have presented a prima facie case of retaliation. *Id.* To make a prima facie case, plaintiffs must show: 1) they engaged in protected conduct; 2) a reasonable employee would have found the challenged retaliatory action materially adverse; and 3) the materially adverse action was causally linked to the protected conduct. *See Burlington Northern & Santa Fe Ry. Co. v. White,* ___ U.S.___, 126 S.Ct. 2405, 2410-16 (2006); *Higgins v. Gonzales,* 481 F.3d 578, 589 (8th Cir. 2007). Plaintiffs claim that Trice retaliated against them for their protected activity of filing claims with the EEOC. That retaliatory action, as related previously, included closely scrutinizing and criticizing their work, suspending their DEU authority, denying or delaying requests to work from home, scrutinizing travel vouchers, interfering with O'Brien's travel to Texas, asking Peterson to delay her staff evaluations and denying her request to give O'Brien an award, and attempting to institute disciplinary action against them.

The purpose of the anti-retaliation provision is "to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms ⋯ by prohibiting employer actions that are

likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington Northern,* 126 S.Ct. at 2415. "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* The Supreme Court noted that "courts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable," *id.* (internal quotations omitted), and emphasized that context and the particular circumstances of any given act of retaliation are to be considered in applying the standard set forth. *Id.* The Supreme Court clarified that "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint. By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 2416.

The standard under *Burlington Northern* is objective and asks the Court to consider what a reasonable employee would do in O'Brien's and Peterson's shoes. *Higgins, supra.* Applying the new standard, the Court finds plaintiffs have not met their burden. Unlike the plaintiff in *Burlington Northern,* plaintiff have not shown Trice's allegedly retaliatory actions were materially adverse such that a reasonable employee in their situations would have been dissuaded from complaining about discrimination. Plaintiffs complain Trice yelled at them, became overly involved in reviewing and controlling their files, denied their requests to work from home, scrutinized their actions too closely, removed their DEU authority, considered disciplinary action against them, and limited their

14

contact with his superiors. As in *Higgins,* the record reflects Peterson, O'Brien's supervisor,[12] had personality conflicts but there is nothing in the record "to suggest this conflict created a situation so unbearable or bleak that a reasonable employee would have been dissuaded from complaining about discrimination in such an environment." *Higgins*, 481 F.3d at 590. Plaintiffs cannot make their claims "based on personality conflicts, bad manners, or petty slights and snubs." *Id.* at 591. *See also Carpenter v. Con-Way Cent. Express, Inc.,* 481 F.3d 611 (8th Cir. 2007)(employer's failure to stop co-worker's racial comments and conduct not sufficient to make a prima facie case of retaliation).

In *Gilmore v. Potter,* 2006 WL 3235088 (E.D.Ark. Nov. 7, 2006), a postal employee filed numerous claims including hostile work environment and retaliation. The employee alleged the defendant isolated her in a small room, threatened her with being fired if she came out of the room onto the work floor, told her she was worthless, and told her not to talk to co-workers. The court found those facts did not support a prima facie case applying the *Burlington Northern* principles. In *Fair v. Arkansas Public Employees Retirement System,* 2006 WL 3210009 (E.D. Ark. Nov. 6, 2006), the plaintiff alleged a Title VII retaliation claim. Fair's allegations included that she was forced to cross-train, defendant refused to give her the opportunity to gain experience, she was assigned work which gave her the same duties as white employees but was paid less, she was not given the opportunity to interview for a position which would have been a promotion, was relocated

---

[12]In a note she wrote the day after Trice spoke at an orientation session in June 2001, Peterson described Trice as an "egotistical, egocentric, arrogant bastard." Def's. Mot. Summ.J., Ex. 6. In a three-way telephone conversation with two of her co-workers, one of whom was Thibodeaux-Horne, Peterson said she became frustrated with them and "said something to the effect of would you let me finish my fucking sentence." Def's. Mot. Summ. J., Ex. 4 at 209-10. She described Trice as being like a "Dr. Jekyll and Mr. Hyde." *Id.* at 215.

to a less comfortable office, an accounting error was attributed to her which should have been attributed to a white employee, and she was given inadequate training. Applying *Burlington Northern,* the court found that Fair failed to allege an employment action which would have dissuaded a reasonable person from making or supporting a charge of discrimination.

Title VII "does not set forth 'a general civility code for the American workplace.' An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Carpenter,* 481 F3d at 619. Viewing the evidence in a light most favorable to plaintiffs, the Court finds no reasonable worker likely would be dissuaded from making or supporting a charge of discrimination based upon the activities of Trice. The Court finds Trice's conduct not so severe and pervasive as to create a hostile work environment.

**Constructive Discharge**

An employee is constructively discharged when an employer renders the employee's working conditions intolerable and thus forces her to quit her job. *Baker v. John Morrell & Co.,* 382 F.3d 816, 829 (8th Cir.2004). A constructive discharge arises only when a reasonable person would find her working conditions intolerable. *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir. 1995). "An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." *Id.* at 498. To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force her to quit. *Tatum v. Ark. Dep't of Health,* 411 F.3d 955, 960 (8th Cir.2005). A plaintiff may meet the second element by showing her "resignation

16

was a reasonably foreseeable consequence of [her employer's] discriminatory actions." *Hukkanen v. Int'l Union of Operating Eng'rs,* 3 F.3d 281, 285 (8th Cir.1993). *See also Smith v. World Ins. Co.,* 38 F.3d 1456, 1462 (8th Cir. 1994)(plaintiff must show the employer created the intolerable conditions intending to force the plaintiff to quit).

Peterson argues her decision to quit was a reasonably foreseeable consequence of Trice's harassment. Even if there were sufficient evidence to establish a disputed issue of fact as to whether Trice's actions were in retaliation for Peterson filing EEOC complaints or because of her race, there is no evidence from which a jury could find an intent to compel her resignation. *See MacGregor v. Mallinckrodt, Inc.,* 373 F.3d 923, 928 (8th Cir.2004) ("A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation."); *Reedy v. Quebecor Printing Eagle, Inc.,* 333 F.3d 906, 910 (8th Cir.2003) (graffiti associated directly with plaintiff's name such as "coon," "all niggers must die," and "kill all niggers," the last of which was not removed after notice to the employer, was not sufficient to show conditions so intolerable a reasonable person would have quit).

Viewing the evidence in a light most favorable to Peterson, the Court finds the record fails to support the presence of objectively intolerable working conditions. Peterson fails to produce evidence suggesting Trice intentionally created an intolerable working condition in an effort to cause her to quit.

**Conclusion**

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [docket entry #4] is hereby granted. Judgment will be entered for defendant..

DATED this 15th day of May 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE